IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD DENNIS BLAMEY,

            Petitioner,                   No. CIV S-04-1256 LKK DAD P

     vs.

TOM CAREY, et al.,

            Respondents.          <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on August 17, 2001 in the Nevada County Superior Court on charges of second degree murder with use of a deadly or dangerous weapon.  He seeks relief on four grounds: (1) failure of the prosecution to disclose evidence favorable to the defense; (2) ineffective assistance of appellate counsel; (3) ineffective assistance of trial counsel; and (4) the conviction was obtained by depriving petitioner of his due process right to present a complete defense.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

/////

1

FACTUAL BACKGROUND[1]

Defendant admitted killing the victim, but claimed self-defense or imperfect self-defense.[2] Defendant testified that he and the victim arose at their home in Truckee in the early morning hours of March 27, 2000, and made preparations for the victim's commute to her job at the Department of Justice in the Sacramento area. Defendant testified the victim started yelling at him because he had placed a vacuum in the back seat of her vehicle. Defendant gave her a shove. The victim pushed him back, pulled a stun gun from her purse, and used it on his arm. Defendant knocked the stun gun from her hand and they wrestled with each other. The victim grabbed a one-gallon can of paint and swung it at defendant, striking him in the chest. Defendant, fearing for his life and the victim's possible use of one of her guns, grabbed the can of paint from the victim and, using both hands, "brought it down on top of her." The victim then got hold of a steam iron and struck defendant. Defendant struck the victim with the iron while wrestling for it, and then he "managed to take it away from her and brought it down on her head once more." The victim grabbed a 17-pound rock that was sitting on a cabinet top and hurled it at defendant, hitting him in the leg. Defendant retrieved the rock and hurled it back at the victim, hitting her in the head. Defendant examined the victim. He detected her heart had stopped beating. Defendant placed the victim's body in her vehicle. He cleaned up the room where the altercation had occurred because the victim had been concerned with cleanliness. Defendant drove to and placed the victim's body in a remote field, because it was serene and defendant believed the victim would have enjoyed it as her final resting place.

Defendant abandoned his vehicle in Roseville and boarded a bus to Reno. Defendant did not complete the trip to Reno; instead, he was dropped off in Truckee. Defendant walked to his residence, where he saw Nevada County law enforcement officers present. Defendant did not turn himself in because he feared poor treatment; instead, he wandered for a couple of days before surfacing at a law office in Reno.

---

[1] The following summary is drawn from the September 9, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-8, filed in this court on November 17, 2004, as Exhibit C to the Answer.

[2] Imperfect self-defense arises when a person acts upon an actual belief in the need to protect himself against an imminent peril to life or of great bodily injury. (In re Christian S. (1994) 7 Cal. 4th at 768, 783.) In self-defense, the belief in the need to act must be both actual and reasonable; but in imperfect self-defense, it is enough that the belief be actual. (Ibid.) Imperfect self-defense does not exonerate; however, it eliminates the malice that otherwise would be established by an intent to kill. (Id. at p. 773.) Hence, imperfect self-defense will reduce a homicide to voluntary manslaughter rather than murder. (Ibid.)

Defendant was examined after his arrest by a criminalist.  He had minor bruises and abrasions on his back, elbow, forearm, and leg, as well as a possible bite mark on his hand.

The victim's body was examined by a pathologist and her brain was examined by a neuropathologist.  The pathologist testified the cause of death was repeated blows to the head with blunt force instruments such as a paint can, steam iron, or large rock.  The blows, which numbered between six and twelve, were delivered with force usually found in high speed automobile collisions.  Part of the victim's left ear had been cut off.  The victim had defensive wounds on her arms and hands, but the blows to the head likely knocked her out.  Some of the blows were delivered after the victim lost consciousness, and she survived the initial blows by minutes up to perhaps one hour.

The neuropathologist also testified the victim died from blunt force trauma to the head.  Like the pathologist, she determined the blunt force trauma to the head had been delivered with the force found in automobile accidents.  The neuropathologist differed from the pathologist regarding the length of time from the attack to the victim's death:  the neuropathologist testified her examination of the victim's brain cells led her to conclude that the victim lived for at least one hour and possibly up to eighteen hours after the attack, but most likely for approximately four to six hours.

In order to bolster his claim of self-defense, defendant introduced evidence that the victim had an explosive temper, used vulgar language when angry, had aggressive reactions to people, and possessed weapons.  Defendant called a number of witnesses, as well as a psychologist, who testified defendant was not a violent or angry person.  Defendant also called a number of witnesses who testified that the victim was occasionally inflexible, angry, and aggressive.

Roy Rioux, a Catholic priest who had known defendant 17 years, testified defendant was not known to be an angry or violent person and that he was affectionate toward the victim.

Gary Kirk, a friend of defendant, testified he never saw defendant lose his temper.

James Blamey, defendant's son, testified that the victim was inflexible and could not relax.

Theodore Rogge, a friend of defendant's son, testified he had seen the victim become extremely angry and yell at defendant about the landscape of her house.

/////

Allen Benitez, the victim's supervisor at the Department of Justice, testified that he had a verbal dispute with the victim several days prior to her death, and that the victim raised her voice.

Ron Lill, who knew both defendant and the victim, testified concerning an incident at a beach party in July 1994. They had brought firewood to make a fire but someone took it when they were not looking. The victim became furious, aggressive and started shouting.

Ida Jessop, who was present at the beach party, confirmed Lill's account of the victim's outburst. Jessop also was with the victim on a trip to Hawaii and saw the victim become furious because their companions wanted to share her food.

Randy Neff, a friend of defendant's son, testified he saw the victim, while working on the roof of her residence, become so upset that she used profanity and threw a hammer off the roof.

Veronica Riley, one of the victim's fellow workers, testified the victim complained of headaches, nausea, and vertigo.

Defendant himself testified that the victim developed a short temper, was increasingly unhappy, and experienced mood swings beginning in 1998. Defendant also was permitted to introduce a caricature of the victim pulling a gun from her purse.[3] The victim wanted to hang the drawing in their residence, but defendant objected due to his general opposition to guns.

Allan Pohle, who inventoried the victim's property, testified he discovered a nine-millimeter pistol with three magazines, a Smith and Wesson semiautomatic, a twelve-gauge shotgun, and ammunition for various firearms among her belongings.

In addition to these witnesses, defendant sought to introduce evidence obtained from a computer belonging to both defendant and the victim. Michael Menz, a computer expert with the Sacramento County Sheriff's Department, testified that a scan of the computer's hard drive disclosed that a divorce-related Internet Web site had been accessed. Menz testified that the Web site "had text such as, a time to kill and a time to heal, how to waste but not to build, how to kill men but not how to save them, how to waste but not how to build, how to kill men, it appeared that that was a [W]eb [site] that was visited by the browser at one point in time." The Web site contained a reference to unhappy housewives enduring divorce and a reference to a man hiring a hit man to kill

---

[3] The victim's former boyfriend testified the caricature had been given to the victim by a coworker a number of years earlier.

4

his wife.  Menz was unable to verify which user had accessed the Web site.

Menz also discovered an e-mail that had been sent to defendant concerning things to do under stress, one of which was killing one's spouse.

Defendant testified that he had not accessed the Web site in question.  Defendant also made an offer of proof that the victim's children would testify that the victim had had conversations with them concerning divorcing defendant.

The court excluded the evidence on the basis of Evidence Code section 352, stating:  "Unless we know exactly what the items on the [W]eb site are, how they are each accessed, who accesses them, even assuming she accesses them.  The problem is, in a case like this where you're dealing with somebody who was a peace officer, there's a number of different scenarios or theories one could postulate as to how this could be there for totally innocent reasons.  And I'm not going to ask the jury to speculate."

The other item of excluded defense evidence was a book entitled *Dance with Anger*, which was found among the victim's personal effects.  In response to the court's request for an offer of proof, defense counsel stated:  "That book, your Honor, is a book dealing with women's issues and women's anger in the dynamics of a relationship, that is further evidence, corroborative evidence of [defendant's] statements to police and his belief that she was in fact suffering from anger.  Now I suppose one could say, well, she may have been reading the book in the course of her employment.  Well, it's doubtful.  She was a sexual predator investigator, that's the area she was working in . . . .  It's a question of [sic] not of admissibility, in my view, it's a question of weight, and I think it's corroborative evidence of [defendant's] theory that she had been suffering from anger and was blowing up over the smallest of things, and on the morning in question blew up over a vacuum cleaner being placed in the back seat."

The court excluded the book because there was no showing that defendant was aware that the victim even had the book, that any probative value for admitting the book pursuant to Evidence Code section 1103 was outweighed by the potential for prejudice, and the book was cumulative to the other evidence of the victim's explosive personality.

PROCEDURAL BACKGROUND

Petitioner filed a timely appeal of his judgment of conviction, raising the sole claim that his right to due process was violated by the trial court's exclusion of evidence relating

5

to the murder victim's reputation for violence.  (Answer, Ex. B.)  The California Court of Appeal rejected petitioner's argument in this regard in an unpublished order dated September 8, 2003.  (Answer, Ex. C.)  Petitioner subsequently filed a petition for review in the California Supreme Court.  (Answer, Ex. D.)  That petition was summarily denied by order dated November 12, 2003.  (Answer, Ex. E.)

On approximately December 22, 2003, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, claiming that the prosecutor committed misconduct when he withheld material favorable to the defense and that petitioner's appellate counsel rendered ineffective assistance.  (Answer, Ex. F.)  That petition was summarily denied by order dated April 14, 2004.  (Id.)

On May 6, 2004, petitioner filed a second petition for writ of habeas corpus in the California Supreme Court, in which he claimed that his trial counsel rendered ineffective assistance.  (Answer, Ex. G.)  That petition was denied on August 11, 2004, with citation to In re Clark, 5 Cal. 4th 750 (1993).  (Id.)

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

1  1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

2  habeas corpus relief:

3        An application for a writ of habeas corpus on behalf of a
   person in custody pursuant to the judgment of a State court shall

4        not be granted with respect to any claim that was adjudicated on
   the merits in State court proceedings unless the adjudication of the

5        claim -

6        (1) resulted in a decision that was contrary to, or involved
   an unreasonable application of, clearly established Federal law, as

7        determined by the Supreme Court of the United States; or

8        (2) resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the

9        State court proceeding.

10  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

11  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

12        The court looks to the last reasoned state court decision as the basis for the state

13  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

14  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

15  federal habeas court independently reviews the record to determine whether habeas corpus relief

16  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

17  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

18  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

19  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

20  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

21  1167 (9th Cir. 2002).

22  II.  Petitioner's Claims

23        A.  Prosecutorial Misconduct

24        Petitioner's first claim is that the trial prosecutor committed misconduct when he

25  failed to disclose exculpatory evidence to the defense.  Specifically, he argues that the victim's

26  supervisor, an investigative detective working for the California Department of Justice,

improperly delayed in producing evidence that the victim had on several occasions become angry

and confrontational in the workplace, only disclosing this information after the trial was

underway.  Petitioner contends that the supervisor, as an agent of the state, had a duty equal to

the duty of the prosecutor to disclose this information to the defense in a more timely manner.

Petitioner describes his claim in this regard as follows:

> A Calif. investigative agent participating in the prosecutorial
> investigation was the victim's former supervisor and co-worker for
> 17 years.  He suppressed evidence of the victim's workplace
> struggles with occupational stressors, resulting in personality
> change, mood swings, disposition for anger and confrontation, the
> results of a wearing DOJ supervisory job stress condition.  The
> evidence was withheld for 13 months being voluntary released to
> the defense in-camera after trial had commenced and court ordered
> proceedings had terminated.

(Pet. at 6.)  Petitioner raised this claim for the first time in a petition for writ of habeas corpus

filed in the California Supreme Court.  (Answer, Ex. F.)  The Supreme Court summarily rejected

the claim.

The state court record reflects that on May 17, 2001, the second day of the

evidentiary portion of the trial, petitioner's counsel raised a concern about the late receipt of

discovery materials from the prosecution.  Defense counsel specifically complained about an

interview by the Department of Justice with the victim's supervisor, Allen Benitez, wherein

Benitez described the victim's mood swings prior to her death.  Petitioner's counsel made the

following comments:

> . . . I get a report yesterday morning of an interview which took
> place on May 11, and in that interview Allen Benitez, Michiel's
> supervisor, says over the period of time, the months prior to this,
> she'd become a very hostile and angry person, very difficult to deal
> with, and confrontational and aggressive.  Well, the same things
> Mr. Blamey tells the police.  Why I'm even more troubled about
> this report, Judge, is because he also says that the other DOJ
> officers who said that she was happy-go-lucky, and I'll read out
> what he says, Benitez states that he wanted the Nevada County
> District Attorney's office to be aware of the fact that Michiel was
> experiencing mood swings and he believes that some of the DOJ
> personnel who provided information that Blamey was always
> happy and upbeat may have done so as to protect her memory and

they probably would not have wanted to get into the issue of her mood swings. That's a problem, Judge. In addition, he makes reference to two other people who witnessed on Friday before this event, Michiel Blamey had a blowup, rage confrontation with Allen Benitez, in this report. And Allen Benitez confronted her and said, what the hell has gotten into you? Bear in mind, he's her boss. Two other people from DOJ witnessed this and don't come forward and don't write reports about it. I'm troubled, Judge.

(Reporter's Transcript on Appeal (RT) at 325-26.) The prosecutor responded that the interview with Benitez "was the 14th, and it was received by the District Attorney's office on the 15th and discovered on the 16th." (Id. at 326; see also Traverse, Ex. C.) The prosecutor also offered to allow defense counsel to "compare files to make sure he has all the discovery." (RT at 326-27.) After a discussion regarding the nature and timing of the discovery that had been produced to the defense up to that point, the trial court informed petitioner's counsel that "if you run into problems like this in the future and request a continuance of the trial, we may very well have to do that" and that "if something comes up in the future you will be given a continuance to deal with it if it becomes necessary." (Id. at 333, 334.) Petitioner's counsel stated that he had issued a subpoena to Mr. Benitez after receiving a copy of Benitez's interview with the Department of Justice and that he expected to call Benitez as a trial witness. (Id. at 333.) Defense counsel also made clear that he was "not accusing [the prosecutor] of bad faith at all." (Id.)

The defense portion of the trial began on May 24, 2001. Petitioner called Agent Benitez as a witness. (Id. at 930.) Benitez testified that he was the victim's supervisor at the Department of Justice. (Id. at 933.) He stated that after the victim received a promotion to a more stressful job, he noticed that she became abrupt and rushed. (Id. at 933-34.) Benitez also testified that he had a conversation with the victim a few days before her death, during which she yelled at him and was uncharacteristically confrontational. (Id. at 940.)

The United States Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

9

1   the prosecution." <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). <u>See also</u> <u>Bailey v. Rae</u>, 339 F.3d

2   1107, 1113 (9th Cir. 2003). The duty to disclose such evidence is applicable even though there

3   has been no request by the accused. <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976). There are

4   three components of a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused,

5   either because it is exculpatory, or because it is impeaching; the evidence must have been

6   suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

7   <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). <u>See also</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691

8   (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005).

9          In order to establish prejudice, a petitioner must demonstrate that "'there is a

10  reasonable probability' that the result of the trial would have been different if the suppressed

11  documents had been disclosed to the defense." <u>Strickler</u>, 527 U.S. at 289. "The question is not

12  whether petitioner would more likely than not have received a different verdict with the

13  evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a

14  verdict worthy of confidence." <u>Id.</u> (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)). <u>See</u>

15  <u>also</u> <u>Silva</u>, 416 F.3d at 986 ("a <u>Brady</u> violation is established where there 'the favorable evidence

16  could reasonably be taken to put the whole case in such a different light as to undermine

17  confidence in the verdict.'") Once the materiality of the suppressed evidence is established, no

18  further harmless error analysis is required. <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416 F.3d at 986.

19  "When the government has suppressed material evidence favorable to the defendant, the

20  conviction must be set aside." <u>Silva,</u> 416 F.3d at 986.

21         After a review of the record in this case, the court concludes that petitioner has

22  failed to establish he was prejudiced by the failure of the prosecutor and/or Mr. Benitez to make

23  an earlier disclosure of Benitez's interview with the Department of Justice investigator

24  addressing, among other subjects, the workplace argument Benitez had with the victim shortly

25  prior to her death. Delay in disclosure does not deprive an accused of due process where

26  disclosure is made during trial and the disclosure, though tardy, is still of value to the accused.

1   See United States v. Vgeri, 51 F.3d 876, 880 (9th Cir. 1995).  Due process requires only that

2   disclosure of exculpatory material be made in sufficient time to permit the defendant to make

3   effective use of that material.  See e.g., United States v. Juvenile Male, 864 F.2d 641, 647 (9th

4   Cir. 1988) ("No violation occurs if the evidence is disclosed to the defendant at a time when the

5   disclosure remains of value."); United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir. 1988)

6   LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987) ("In determining whether disclosure was

7   timely enough to satisfy due process, we consider the prosecution's reasons for late disclosure . . .

8   and whether the defendant had an opportunity to make use of the disclosed material.")

9            In this case, disclosure of Agent Benitez's interview occurred after the trial began

10  but prior to the presentation of the defense case.  After reviewing the discovery, petitioner's

11  counsel called Benitez as a witness and made use of his interview statements during the

12  examination of the witness.  (See RT at 944-45.)  Under these circumstances, petitioner suffered

13  no prejudice from the timing of the disclosure of this discovery because he "had an opportunity

14  to make use of the disclosed material."  LaMere, 827 F.2d at 625.  Lack of prejudice is also

15  demonstrated by the fact that petitioner's counsel did not request a continuance in order to

16  respond to the interview report, to conduct an expanded investigation into the victim's mental

17  state, or for any other reason, even though the court offered to grant a continuance for this

18  purpose.  Counsel was prepared to proceed with the defense case without a continuance.  See

19  United States v. Smith, 292 F.3d 90, 101-03 (1st Cir. 2002) (in a delayed disclosure of discovery

20  case where defense counsel was granted a three-day continuance of his cross-examination of the

21  witness in question and did not complain that the continuance was insufficient to adequately

22  prepare, the defendant's later claim of prejudice attributable to the late disclosure is either not

23  preserved or undermined).  In short, even assuming that the prosecution team failed to disclose

24  the interview with Benitez in a timely manner, petitioner suffered no prejudice as a result.

25  Accordingly, the state court's decision rejecting petitioner's claim of a Brady violation is not

26  contrary to or an unreasonable application of federal law and may not be set aside.

1    B.  Ineffective Assistance of Counsel

2           Petitioner claims that both his trial and appellate counsel provided ineffective

3    assistance.  After setting forth the applicable legal principles, the court will evaluate these claims

4    in turn below.

5           1.  Legal Standards

6           The Sixth Amendment guarantees the effective assistance of counsel.  The United

7    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

8    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

9    counsel, a petitioner must first show that, considering all the circumstances, counsel's

10   performance fell below an objective standard of reasonableness.  Id. at  687-88.  After a

11   petitioner identifies the acts or omissions that are alleged not to have been the result of

12   reasonable professional judgment, the court must determine whether, in light of all the

13   circumstances, the identified acts or omissions were outside the wide range of professionally

14   competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

15   petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

16   466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

17   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

18   694.  A reasonable probability is "a probability sufficient to undermine confidence in the

19   outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

20   (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

21   deficient before examining the prejudice suffered by the defendant as a result of the alleged

22   deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

23   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

24   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

25           In assessing an ineffective assistance of counsel claim "[t]here is a strong

26   presumption that counsel's performance falls within the 'wide range of professional assistance.'"

1   Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There

2   is in addition a strong presumption that counsel "exercised acceptable professional judgment in

3   all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

4   Strickland, 466 U.S. at 689).

5           The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

6   v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

7   However, an indigent defendant "does not have a constitutional right to compel appointed

8   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

9   professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

10  (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

11  ability of counsel to present the client's case in accord with counsel's professional evaluation

12  would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

13  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

14  not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

15  meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

16  showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

17  to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

18  context, petitioner must demonstrate that, but for appellate counsel's errors, he probably would

19  have prevailed on appeal.  Id. at 1434 n.9.

20          2.  Trial Counsel

21          Petitioner claims that his trial counsel rendered ineffective assistance.  In the

22  petition, the claim is stated in its entirety as follows:

23          NEW EVIDENCE that an error of fact existed at the time of
            judgment, not introduced at trial, not having been disclosed to the
24          defendant by trial counsel . .  Trial counsel and investigative agents
            secured pre-trial information that the victim suffered from a life-
25          long trauma as a victim of child abuse and subsequent stressors.
            Agent's shelved the information [Exhibit 'A'].  2 years after trial
26          concluded, agents 'rediscovered' the information [Exhibit 'B'].

13

1
2
3

> The petitioner received the information on February 20, 2004.
> Counsel's lack of attention in not investigating this information
> prejudiced the defendants right to present the evidence to a trier of
> fact, which may have changed a juror's mind.

4  (Pet. at 7.)  In support of his claim, petitioner has filed several exhibits.  One exhibit indicates

5  that on December 1, 2003, petitioner's trial attorney sent him a list of items which were

6  recovered from petitioner's house in Truckee.  (Pet. Ex. A-1.)  Another exhibit indicates that on

7  April 14, 2000, several items were recovered from two vehicles stored in Truckee and removed

8  to the custody of an investigative agency entitled "The Advantage Group."  (Pet., Ex. A-2.)  The

9  final exhibit is a February 20, 2004 letter from trial counsel to petitioner stating that he was

10  enclosing "the documents you indicated you wanted sent to you."  (Pet., Ex. B.)  None of these

11  exhibits appear to contain or refer to anything relevant to childhood sexual abuse suffered by the

12  victim.  In the answer, respondents state that they are not able to respond in any detail to

13  petitioner's claim of ineffective assistance of trial counsel because of petitioner's "failure to

14  either provide copies of the documents in question or at least describe them in enough detail so

15  that their relevance and admissibility can be determined."  (Answer at 24 n.5.)

16          In his traverse, petitioner attempts to provide substance to the ineffective

17  assistance of trial counsel claim contained in the petition.  He explains that one of the documents

18  sent to him by his trial counsel on April 14, 2000, which was removed from the victim's vehicle

19  in Truckee, was a pamphlet and workbook for "women and men survivors of child sexual abuse"

20  entitled "The Courage to Heal." (Traverse at 27 & Ex. Q.)  Petitioner represents that this

21  document was "effectively [the victim's] mental health journal."  (Traverse at 28.)  Petitioner

22  states that "an investigator for the defense" discovered the workbook on April 14, 2000, after a

23  search of the victim's vehicle.  (Id. at 29.)  He argues that because of counsel's failure to

24  investigate and introduce the workbook into evidence, "defense counsel failed to address agent

25  Blamey's struggles with an incestuous post traumatic childhood sexual abuse syndrome stressor

26  which in decided probability, fueled the vicious and maligned assault on the defendant in the

1  morning of March 27, 2000." (<u>Id.</u> at 30.)  Petitioner contends that his trial counsel should have

2  used the pamphlet to make a "defensive claim that the defendant had reacted in panic to a [sic]

3  angry, raging, out of control assault by agent Blamey, elevated with a weapon." (<u>Id.</u> at 43.)

4  Petitioner argues that he suffered prejudice from his counsel's failure to investigate and present

5  evidence of the victim's history of childhood sexual abuse because it would have supported his

6  defense that he simply defended himself from the victim's attack.

7           The court notes, first, that there is no evidence that the workbook entitled "The

8  Courage to Heal" belonged to the victim or that the handwriting contained therein is hers.  Even

9  assuming the handwriting contained in the book is the victim's, there is no evidence as to her

10 motive in making the entries that appear therein.  Even if the workbook was filled out by the

11 victim in order to confront her own past history of childhood sexual abuse, petitioner has failed

12 to demonstrate that his trial counsel's failure to present this evidence to the jury constituted

13 ineffective assistance.  According to petitioner, a <u>defense</u> investigator discovered the workbook

14 some time prior to trial.  This court must therefore assume that petitioner's trial counsel knew

15 about the workbook but, as a matter of trial strategy, decided not to use it.  <u>See</u> <u>Strickland</u>, 466

16 U.S. at 689 (there is a strong presumption that counsel's conduct falls within the wide range of

17 reasonable professional assistance, or what "might be considered sound trial strategy").

18 Counsel's tactical decision in this regard is "virtually unchallengeable."  <u>Furman v. Wood</u>, 190

19 F.3d 1002, 1006 (9th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 687).

20           Even assuming that petitioner's trial counsel rendered ineffective assistance in

21 failing to discover and/or further investigate the workbook, petitioner has failed to demonstrate

22 prejudice.  Petitioner does not explain how the victim's alleged  history of childhood sexual

23 abuse had any significant bearing on his defense that she was the aggressor in their altercation or

24 that petitioner killed her in self-defense.  Petitioner's argument that the victim's childhood

25 trauma "fueled the vicious and maligned assault on the defendant" is based on pure speculation.

26 /////

1    This court is unconvinced that the result of the proceedings would have been different if the jury

2    had been presented with evidence of the workbook found in the victim's car.

3              Because petitioner has failed to demonstrate either substandard performance or

4    prejudice, he is not entitled to relief on this claim.

5              3.  Appellate Counsel

6              Petitioner claims that his appellate counsel rendered ineffective assistance because

7    he failed to raise a prosecutorial misconduct issue on appeal based on the prosecutor's failure to

8    timely disclose to the defense the Department of Justice interview of Benitez.  Specifically,

9    petitioner alleges:

10                 Despite several requests by appellant, counsel did not research
                   materials and information to review in any significant measure the
11                 prosecutorial disclosure violation as well as not having addressed
                   with reasonable merit the substance of said agent's corrupt
12                 endeavor to obstruct the due administration of justice.  Counsel's
                   inaction, in the face of a murder conviction, denied the petitioner
13                 within the appellate process, the right to a 'substantial presentation
                   of 'structural error'.
14

15   (Pet. at 6.)

16              Petitioner has failed to demonstrate prejudice with respect to this claim.  For the

17   reasons explained above, petitioner's claim that the prosecutor committed Brady error is

18   meritless.  Appellate counsel's decision to press only issues on appeal that he believed, in his

19   professional judgment, had more merit than the Brady claim suggested by petitioner was "within

20   the range of competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397

21   U.S. 759, 771 (1970).  Indeed, petitioner states that he asked counsel to investigate a Brady claim

22   and that counsel agreed to consider the issue in preparing the opening brief but ultimately "chose

23   not to" include it in the appeal.  (Traverse at 19, 22.)  Counsel apparently decided that the issue

24   lacked merit and should not be pursued.  There is no evidence in the record that counsel's

25   investigation of this issue was incomplete, that a more thorough investigation would have

26   revealed a meritorious issue on appeal, or that appellate counsel's decision not to raise a Brady

16

1   issue fell below an objective standard of reasonableness.  The state court determination with

2   regard to petitioner's claim of ineffective assistance of appellate counsel was not contrary to, or

3   an unreasonable application of Strickland.  Accordingly, petitioner is not entitled to habeas relief.

4                   C.  Erroneous Exclusion of Evidence

5                   Petitioner next claims that the trial court deprived him of his constitutional right

6   to present a defense when it excluded from evidence the materials discovered on his computer

7   and the book "Dance With Anger," described in the opinion of the California Court of Appeal.

8   Petitioner argues that this evidence was relevant to show the victim's character traits of

9   "explosive temper, uncontrolled anger and need for close held deadly weapons in the domestic

10  household" and her "reputation for violence."  (Pet. at 7.)

11                  Petitioner argues that the web site found on their home computer should have

12  been admitted into evidence because:

13              it supports petitioner's claim and submits that agent Blamey had a
                dark character trait and that accused was justified in fearing that
14              she might try to kill him during her raging assault.  This evidence
                also adds substance to petitioner's testimony that agent Blamey
15              fiercely escalated the 'vacuum cleaner' confrontation with a stun-
                gun assault once the encounter began.  Evidence that she may have
16              contemplated violence against her husband supports testimony that
                agent Blamey acted violently in this case.

17

18  (Traverse at 52.)  Petitioner notes that the web site evidence was excluded, in part, on the basis

19  that the victim might have accessed the information in connection with her job assignment

20  involving domestic violence cases.[4]  Petitioner disputes the notion that the victim was assigned to

21  _____

22          [4] Specifically, the trial judge made the following statements:

23              Mrs. Blamey at the time of her death had an assignment in a
                department at the Department of Justice that involved domestic
24              violence, and therefore I believe there's an additional reason under
                352 not to allow that testimony, because the reasons for her having
25              that information, even if I were to find that she was the one who
                accessed it, could be totally innocent.

26  (RT at 1063.)

                                                17

1  domestic violence cases and argues that the trial court's reliance on "hearsay" information that

2  she was so assigned violated his right to confront the witnesses against him.  (Id. at 53.)

3        Petitioner argues that the book entitled "The Dance of Anger" should have been

4  admitted into evidence because it was relevant to show that the victim

5        herself, acknowledged she was suffering from acute stress,
6        uncontrollable anger and a predisposition for blowing up over
       minute issues and on the morning in question blew up over which
7        [sic] the accused perceived to be a 'vacuum cleaner issue.'

8  (Id. at 55.)  Petitioner states that evidence the victim possessed this book supported his theory

9  that she was the aggressor in the altercation and corroborated his "reasonable belief that agent

10  Blamey was suffering from anger, stress, lack of restraint, losing control over all things, small

11  and large."  (Id. at 56, 57.)  He contends that the book "was in fact the most probative evidence

12  offered on the issue of her personal anger management difficulties" and, for that reason, should

13  not have been excluded from evidence as cumulative.  (Id. at 58.)  Petitioner summarizes his

14  argument as follows:

15        it was fatal to the defendant's self-defense claim that the
       ABSENCE OF EVIDENCE indicating that agent Blamey was
16        contemplating violence and had a malign predisposition to harm
       the defendant, had created the false impression, JURY SIDE, that
17        agent Blamey was not dangerous and that the defendant's actions
       were unreasonable."

18

19  (Id. at 61.)

20        The California Court of Appeal rejected petitioner's argument in this regard.  The

21  court explained its reasoning in depth as follows:

22        We are unpersuaded by defendant's claim that any error was of
       constitutional magnitude.  On this point, Montana v. Egelhoff
23        (1996) 518 U.S. 37 [135 L.Ed.2d 361] (Egelhoff), is instructive.
       The court wrote:  "[T]he proposition that the Due Process Clause
24        guarantees the right to introduce all relevant evidence is simply
       indefensible.  As we have said:  'The accused does not have an
25        unfettered right to offer [evidence] that is incompetent, privileged,
       or otherwise inadmissible under standard rules of evidence.'
26        [Citation.]  Relevant evidence may, for example, be excluded on

account of a defendant's failure to comply with procedural requirements. [Citation.] And any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence. For example, Federal (and Montana) Rule of Evidence 403 provides: '*Although relevant*, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" (Egelhoff, supra, 518 U.S. at p. 42, italics in original.)

In order to sustain a due process claim based on the allegedly erroneous exclusion of defense evidence, defendant bears a heavy burden. (Egelhoff, supra, 518 U.S. at pp. 47-48.) He must "show that the principle of procedure violated by the rule (and allegedly required by due process) is '"so rooted in the traditions and conscience of our people as to be ranked as fundamental."' [Citation.]" (Id. at p. 47, italics in original.)

Egelhoff supports the conclusion that Evidence Code section 352, which contains language similar to the federal rule quoted with approval in Egelhoff, is constitutional. Egelhoff also places the burden squarely on defendant to establish that exclusion of the proffered evidence offends a fundamental principle of procedure.

In order to meet his burden, defendant argues the exclusion of the proffered evidence violates the long-standing rule in California that a victim's reputation for violence is admissible and highly probative corroboration of a defendant's testimony that the victim acted in a violent manner. (Evid. Code, § 1103; People v. Smith (1967) 249 Cal.App.2d 395, 404.)[5]

While defendant's premise is true, an equally true and countervailing premise is that the court retains the power under Evidence Code section 352 to limit admission of such evidence, as noted in People v. Wright (1985) 39 Cal.3d 576, 587-588, where the California Supreme Court write: "'It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' [Citations.] Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence. [Citation.]

---

[5] Evidence Code section 1103 provides in relevant part: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

1
2
3
4
5
6
7

. . . The admission of such character evidence, however, is not without bounds, but is subject to the dictates of Evidence Code section 352 . . . [¶] Section 352 directs 'the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty. Nonetheless, it cannot be said that the trial judge's ruling on this evidence, of which the probative value was slight and the chance of prejudice and confusion substantial, struck an improper balance and thereby constituted an abuse of discretion.' [Citation.]" (Id. at pp. 587-588.)

8
9
10
11
12
13
14
15
16
17

The same may be said of the trial judge's ruling in the present case. Defendant offered a number of witnesses who testified to the victim's character trait of angry outbursts and aggressive reactions to other people. The proffered evidence – a Web page and a book – did not even rise to the level of being character trait evidence. At best – and assuming that one could reasonably infer that the victim had accessed the divorce Web site and read the book – the proffered evidence tangentially corroborated the other, much stronger evidence which had been admitted to prove the victim's tendency to aggressive behavior. In light of the collateral nature of the proffered evidence, the speculative nature of the victim's access to and use of it, and the potential for juror confusion caused by consideration of marginally relevant materials written by third parties, we fail to discern an abuse of discretion in the trial court's decision to exclude the proffered evidence. (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125.) We also conclude defendant has failed to demonstrate the court's decision constituted federal constitutional error.

18
19
20

Even if we were to accept defendant's premises that the court's ruling constituted federal constitutional error (Egelhoff, supra, 518 U.s. at pp. 47-48), and that review thereof is governed by the standard set forth in Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]), defendant's conviction would still withstand scrutiny.[6] First, as we have just noted, the proffered

21
22
23
24
25
26

[6] The Supreme Court of the United States set forth the applicable standard in Neder v. United States (1999) 527 U.S. 1 [144 L.Ed.2d 35], as follows: "The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, [citation], and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment, [citation], are both subject to harmless-error analysis under our cases. Such errors, no less than the failure to instruct on an element in violation of the right to a jury trial, infringe upon the jury's factfinding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable. We think, therefore, that the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury

20

evidence was barely probative of the victim's character, and only marginally corroborative of the other evidence introduced pursuant to Evidence Code section 1103. Second, defendant was given ample leeway to call a number of witnesses who testified to his benevolent disposition and the victim's angry outbursts and moody state. Third, and most significantly, the forensic evidence completely undermined defendant's claim of self-defense or imperfect self-defense. He suffered minimal injuries while the victim was bludgeoned to death with a steam iron, rock, and paint can, with some of the blows being delivered after she was unconscious. Defendant cleaned up the scene of the altercation, took the victim's body and disposed of it in a field, avoided contact with law enforcement authorities, and left the state. In these circumstances we doubt the jury had any difficulty concluding defendant's claim of self-defense or imperfect self-defense was fabricated, and somewhat poorly at that. Presentation of evidence and argument occurred over 11 court days. Jury deliberation commenced on Friday, June 15, 2001, and, following a weekend break, resumed on Tuesday, June 19, 2001. The jury returned its verdict that evening at 6:05 p.m. The length of deliberations was commensurate with the length of the trial, and the record discloses no confusion over the evidence or instructions or of disagreements among the jurors. In sum, the proffered evidence was properly excluded, and any error in respect thereto was harmless beyond a reasonable doubt.

(Opinion at 9-14.)

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas

relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

Estelle, 502 U.S. at 67-68; Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v.

Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th

Cir. 1991); Pike v. Dickson, 323 F.2d 856, 860 (9th Cir. 1963) ("It is only where criminal trials

in state courts are conducted in such a manner as amounts to a disregard of that fundamental

fairness essential to the very concept of justice that due process is offended and that federal court

interference is warranted.") "A habeas petitioner bears a heavy burden in showing a due process

violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir.

2005). A criminal defendant must demonstrate that his interest in presenting evidence in his

would have found the defendant guilty absent the error?" (Id. at p. 18; accord, People v. Cox (2000) 23 Cal. 4th 665, 577, fn. 6.)

1  favor outweighs the state's interest in reliable and efficient trials before a court should interfere

2  with routine evidentiary matters.  Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983); see also

3  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990); Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.

4  1985).  Only "particularly crucial and reliable evidence" will satisfy this test; "[e]vidence of little

5  importance, whether merely cumulative or of little probative value, will almost never outweigh

6  the state interest in efficient judicial process."  Perry, 713 F.2d at 1453.  In addition, a federal

7  court may not grant habeas relief for trial errors without a showing of actual prejudice, defined as

8  a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

9  Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

10  (1946)).  See also Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000).

11         "[S]tate and federal rulemakers have broad latitude under the Constitution to

12  establish rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S.

13  319, 324 (2006) (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)).  For example,

14  "well-established rules of evidence permit trial judges to exclude evidence if its probative value

15  is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

16  potential to mislead the jury."  Holmes, 547 U.S. at 326.  This latitude, however, "has limits."

17  Id. at 324.  Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to

18  present a defense; this right is "a fundamental element of due process of law."  Washington v.

19  Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986);

20  California v. Trombetta, 467 U.S. 479, 485 (1984); Webb v. Texas, 409 U.S. 95, 98 (1972).

21         The constitutional right to present a defense is not absolute.  Alcala v. Woodford,

22  334 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when

23  the state interest is strong."  Perry, 713 F.2d at 1450.  Thus,

24         [w]here evidence has been excluded pursuant to a state evidentiary
       law, we use a balancing test:  In weighing the importance of
25     evidence offered by a defendant against the state's interest in
       exclusion, the court should consider the probative value of the
26     evidence on the central issue; its reliability; whether it is capable of

22

1

evaluation by the trier of fact; whether it is the sole evidence on the
issue or merely cumulative; and whether it constitutes a major part

2

of the attempted defense. A court must also consider the purpose of
the [evidentiary] rule; its importance; how well the rule

3

implements its purpose; and how well the purpose applies to the
case at hand. The court must give due weight to the substantial

4

state interest in preserving orderly trials, in judicial efficiency, and
in excluding unreliable or prejudicial evidence.

5

6 Alcala, 334 F.3d at 877 (quoting Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  See also

7 Drayden, 232 F. 3d at 711.  Thus, a state law justification for exclusion of evidence does not

8 abridge a criminal defendant's right to present a defense unless it is "arbitrary or

9 disproportionate" and "infringe[s] upon a weighty interest of the accused."  United States v.

10 Scheffer, 523 U.S. 303, 308 (1998).  See also Crane, 476 U.S. at 689-91 (discussion of the

11 tension between the discretion of state courts to exclude evidence at trial and the federal

12 constitutional right to "present a complete defense"); Greene v. Lambert, 288 F.3d 1081, 1090

13 (9th Cir. 2002).  Further, a criminal defendant "does not have an unfettered right to offer

14 [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of

15 evidence."  Egelhoff, 518 U.S. at 42 (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)).

16        The decision of the state appellate court that petitioner's constitutional rights were

17 not violated by the trial court's decision to exclude from evidence the web site found on

18 petitioner's computer and the book entitled "Dance With Anger" is not contrary to or an

19 unreasonable application of the federal due process principles discussed above.  Applying the

20 factors set forth in Miller, this court is persuaded that the exclusion of this evidence did not

21 render petitioner's trial fundamentally unfair or prevent petitioner from presenting his defense.

22 Abundant evidence that the victim had an explosive temper was already before the jury in the

23 form of testimony by numerous witnesses.  As noted by the trial court, the web site evidence was

24 not particularly probative or capable of evaluation by the jury, given that it was not conclusively

25 /////

26 /////

1   established who had accessed the information or why.[7]   Expert witness Menz testified that he was

2   unable to determine who had accessed the information contained on the web site.  (Id. at 963.)

3   Because of these uncertainties, the evidence was not a reliable indicator of anything pertinent to

4   petitioner's trial.  The excluded evidence certainly did not tend to establish the identity of the

5   aggressor in the fight between petitioner and the victim.[8]

6               Nor did the trial court's decision to exclude from evidence "Dance With Anger"

7   violate petitioner's right to a fair trial.  It was not clear whether the victim had bought or even

8   read this book.  Even if she had, the fact that the victim knew she had problems with anger

9   appears to this court to have no bearing on whether she acted violently during the episode in the

10  garage or whether petitioner acted in self-defense when he killed her.  This is especially true

11  given that petitioner did not know about the book until after the victim's death and therefore

12  would have had no reason based upon his wife's possession of the book to fear her alleged

13  aggressive behavior.  Under the circumstances, the trial court's decision to exclude "Dance With

14  Anger" did not render petitioner's trial fundamentally unfair or violate his right to present a

15  defense.  Cf. Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004) (trial court violated petitioner's

16  right to a fair trial and to present a defense where witness's excluded statements were not only

17  reliable, they were material and would have substantially bolstered the petitioner's claims of

18  innocence).

19  /////

20

---

21      [7]  In this regard, this court notes that some of the excluded evidence from the couples'
22  computer included email material that appeared to have been sent to petitioner.  (RT at 959-60.)

23      [8]  Petitioner notes that expert witness Menz found the password "BOLD8SHE" in
    connection with some of the information retrieved from the couples' computer.  (RT at 958.)  He
24  argues that this was a "significant and material fingerprint" which established "the effeminite
    [sic] gender of the user identification."  (Traverse at 50.)  Evidence of a password containing the
25  word "she" does not conclusively establish that the victim accessed all of the website information
    petitioner sought to introduce into evidence.  (See RT at 959-61.)  In fact, as explained above,
26  there was no conclusive evidence establishing who accessed any particular piece of information
    found on the computer.

Finally, the trial court's evidentiary ruling with respect to the web site and the book did not have a substantial and injurious effect on the verdict in this case.  See Brecht, 507 U.S. at 637-38.  As explained by the California Court of Appeal, petitioner's actions after the killing, his physical condition after the fight, and the evidence indicating that some of the blows to the victim were inflicted after she was unconscious "completely undermined" petitioner's contention that he struck the victim in self-defense.  The excluded items would have done nothing to contradict this evidence.

For all of these reasons, petitioner is not entitled to relief on his claim that the trial court's evidentiary rulings violated his right to due process.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 9, 2007.

_Dale A. Drozd_
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
blamey1256.hc

25